Mr. Panuccio or Mr. Townsend? I'm Mr. Panuccio. Okay, so you're going to go first, and you're going to reserve any time of your ten minutes for rebuttal? I'll attempt to reserve two minutes, Your Honor. May it please the Court, Jesse Panuccio for Appellant, Everglades College. If acceptable to the Court, I will focus on mootness, the Education Act, and class certification issues, and my colleague, Mr. Townsend, will focus on due process, administrative law, and standing. This case began and was litigated for years as a simple APA unlawful delay claim. Its settlement, however, represents a breathtaking assertion of executive power by the Secretary of Education. He claims the power to discharge and refund hundreds of thousands of student loans without the individual adjudications required by regulation. This blanket cancellation authority is the very same executive overreach the Supreme Court roundly rejected just six months ago in Biden against Nebraska. Worse still, in this case, the Secretary has used the settlement to deem hundreds of schools as having engaged in, quote, substantial misconduct and institutional misconduct without providing them any process. How many schools are on the list? 151, Your Honor, as now amended, I believe. As this Court said in the United States against Carpenter, it is alien to our concept of law to allow the chief legal officer of the country to violate its laws under the cover of settling litigation. And that is what has happened here. The settlement violates the law in multiple ways. Let me turn first to mootness. Before we turn to that, can you address whether the schools have standing to challenge the settlement approval on appeal? I can, if you'd like, Your Honor. Mr. Townsend was prepared to address that in the first instance. Okay, then that's fine. Okay. That's okay. I'm happy to address it if you'd like to get to that first. Can I have a follow-up question before you, just based on your intro? I mean, would you disagree that the government has the authority to settle if this case was one borrower as opposed to a class? Well, that gets into the question of statutory authority, Your Honor. What I would say is this court in Carpenter, also in the Bonneville Power case, and Carpenter also adopted the reasoning of the Fourth Circuit in executive business. Each one of those cases did not involve a class. They involved individual claims. And what the court said, both the Fourth Circuit and this circuit, is that the attorney general representing a federal agency cannot settle a case outside the bounds of the law. So they could not settle. That's what I'm trying to explore here. What is outside the bounds of the law? Is it the authority to settle at all without making a finding, which is part of what your intro was? And if that's the case, then even settling an individual case without a finding would be improper. Or is it something else? Well, I'd say two things. The settlement we have here, whether it applies to a class of several hundred thousand or one, is illegal. It doesn't just grant relief. It adopts entirely new adjudicatory regimes outside of the regulatory process. It revives claims that are time-barred or otherwise unmeritorious under the regulations. So you could not do that for one person. You could not do it for a hundred. You could not do it for a hundred thousand. This settlement is illegal on any grounds. But moreover, even with respect to one claim, the secretary would have to wrestle with his own regulation that limits his authority. That's 34 CFR 30.70H, which says the secretary may not compromise collection of a debt involving fraud or misrepresentation on the part of the debtor or any party having an interest in the claim. That is what almost all borrower defense claims involve is some kind of allegation of fraud or misrepresentation. So to whatever extent the secretary says he has individual case authority, he would have to square that with his own regulation cabining that authority. And finally on this question, Your Honor, I would just say that to whatever extent the secretary has what you might call dispensation authority for one person, it cannot be used and transformed to cancel the law and rewrite it altogether. That is what Nebraska is about. That is what the OLC memo on the Attorney General Settlement Authority says. And there's also a case out of Virginia in preparing for this argument that seems applicable, where the governor of Virginia, this is Howell v. McAuliffe at 788 Southeastern 2nd 706, where the governor said, well, I have clemency power for an individual. Therefore, I can grant broad-based, class-wide clemency. And the Virginia Supreme Court said you cannot do that because the power to mitigate a general rule of law on a case-by-case basis does not mean you can effectively rewrite the general rule of law and replace it with a categorical exception. And that's what occurred here. The secretary is trying to rewrite borrower adjudication through this settlement. And where it's most obvious, Your Honor, if you look at, we in our brief, we say there's subclass 1, subclass 2, and subclass 3. For subclasses 2 and 3, what the settlement and actually, yeah, 2 and 3, what the settlement says is there was the 2019 rule promulgated, duly promulgated by the department. And the settlement says, well, for subclasses 2 and 3, we're going to nix the 2019 rule and we're going to use the 2016 rule. That is rulemaking through the settlement. The parties decided, secretly, inclusively, that they didn't like the protections that existed for schools in the 2019 rule. So they said, well, we'll just scrap it through the settlement and we'll put hundreds of thousands of people back in the 2016 rule where they have no lawful right to be. So that, clearly, this case is about far more than settling an individual claim. If I may turn to mootness, before the court would reach any of that, it does not need to reach those questions because this case was moot at the time the settlement was lodged. It was moot at the time the district court entered final approval. As the Supreme Court said in Frank v. Gauss, a district court is powerless to approve a proposed class settlement if it lacks jurisdiction over the dispute. By the time this settlement reached the approval stage, the district court had lost jurisdiction. The reason for that is fairly simple. The plaintiffs essentially had two claims in their complaint and then their supplemental complaint. Their main claim was an unlawful delay APA claim. They said they alleged there was a policy of inaction on borrower defense and they wanted the court to tell the department it had to restart adjudications. Their other later claim that they added in the supplemental complaint was they said, well, they've restarted but there are form denials and we think those need to be rescinded because they're unlawful. And critically, this is how plaintiffs characterize their case in the district court. They said plaintiffs do not ask this court to adjudicate their borrower defenses, nor do they ask this court to dictate how the department should prioritize their pending borrower defenses. Their request is simple. They seek an order compelling the department to start granting or denying their borrower defenses and vacating the department's policy of withholding resolution. But what on this record tells us that the government isn't going to go back to the policy that they don't like? Well, you have the declaration from the COO of Federal Student Aid, Richard Cordray. This is at ER 541 to 543, paragraphs 8 through 14, and he says unequivocally that over the last 18 months when he submitted the declaration, the department had, quote, prioritized adjudication of borrower defense applications and 90,000 individual approvals had occurred between June 2019 and June 2022. But nothing about that is binding on a new administration, and a new administration might have a whole different view of this issue. Well, that's always true in every mootness case where the government has changed its position. You could always get the new government actors coming in. But that's why the voluntary cessation exception exists, isn't it? Well, what this court has said, and if you look at the Rosebrock decision, and this was only raised in a footnote in plaintiff's brief, but to the extent the court is looking at the voluntary cessation issue, this court, quote, presumes that a government entity is acting in good faith. That's at page 971 of the Rosebrock decision. And even in that case where it was just, I believe, an agency statement in an email internally, there was a question about whether the agency was properly enforcing its regulation about whether you could post something on a fence, I think, outside the VA or a government agency. And the allegation was there had been inconsistent enforcement, and the responsible official in charge sent an internal email, said, well, now we're going to enforce it uniformly. And this court said, we take that in good faith. There's no indication of bad faith here that they were lying. Well, my concern isn't a lack of bad faith. I mean, I agree with that. But, again, maybe this administration and the statements that are being made, they fully intend to stand beside. But a new administration happens, and a different view about how the Department of Education should be run comes in, and there's nothing about the evidence that you're relying on that will bind future administrations. And so they might go back to doing something that the plaintiffs in this case are challenging. And so why wouldn't we, I mean, when we're talking about mootness, why wouldn't a court just say, okay, this is an issue that needs to be answered, because it might come up again? Well, Your Honor, let me take you back to what plaintiffs said in their complaint. They said their request is simple. They seek an order compelling the department to start granting or denying BD applications. What they said at the time that they filed their complaint is nothing had happened, that there was a complete pause on adjudicating borrower defense. And what Cordray says in his declaration unequivocally is we have restarted. Not only have we restarted, we've processed 90,000 of them. Plaintiffs got exactly what they asked for, and that would be true. Your Honor, I think essentially no 706 unlawful delay case could ever be mooted if the standard Your Honor is proposing were adopted, which would be there's always a possibility that after an agency moots unlawful delay, some other government actor based on some election that might happen in the future might come in years later and have a different policy. But this administration, which has now been in power for several years and will be for some time further, has said we've restarted this. And the evidence shows they have restarted it. The other side has not put in any evidence that says they're not committed. And, Your Honor, the other thing is the government's here. I think you can ask them, do you plan to continue your commitment? And was Mr. Cordray being honest in his affidavit when he said we have restarted and we're committed and we're going to get through this process? All right, counsel, you've gone over your time. I will give you time for rebuttal, but we should hear now from Mr. Cordray. Hi. Good morning, and may it please the Court. I'm Lucas Townsend for Appellant Lincoln Educational Services Corporation, arguing jointly for the appellants, and I would like to reserve two minutes for rebuttal with the Court's permission. And with the Court's permission, I'll discuss standing, the issues of administrative law, due process, and if there are any questions, intervention. To go to Judge Sung's question, the schools are here because we are named in a strategic settlement. That harms us. The executive branch is increasingly using strategic settlements to achieve policy objectives while evading accountability. Well, can you tie that to the standard? My understanding is you would have to show formal legal prejudice to have standing to challenge the settlement approval as a mere intervener. And there seems to be ample case law just saying some sort of harm that might give rise to a claim, even if you have to go pursue it in another litigation. You may have to file your defamation claim or what other injuries. That does not constitute formal legal prejudice, so can you address that? Sure. Well, there's two forms of prejudice in this case. One is reputational, and one is the loss of procedural rights designed to protect concrete interests. The clearest form of prejudice is the reputational harm, the harm that comes from the centerpiece of this settlement. Do you agree that the standard is formal legal prejudice? Your Honor, I don't believe that that is actually the standard. When the Court has entertained objections to settlements, it has not required anything more than a sufficient Article III standard. From a non-class member? Well, so first of all, we're not members of the class. We have intervened, and so there is case law that says interveners can challenge a class settlement. But I'm referring specifically to the cases, the Portland General Electric case, executive business media, and other cases where settlements have been objected to by outside parties. And there, the Court's discussion really boils down to the Article III injury, of whether the person has an Article III injury for purposes of standing. And in those cases, I point the Court to the recent Kennedy v. Warren decision. It was a very straightforward decision in that case involving a reputational injury from a letter that was published on a senator's website. And in three paragraphs, the Court addressed the reputational harm to the— Well, that was a—my understanding is that was a case that was actually filed against— from the person who had the reputational harm injured. It wasn't about the—it wasn't about a challenge to a settlement to which, you know, the inter-party was claiming injury. I mean, I don't see any—it seems to me very clear that we have ample precedent that when you are a non-party to the case and in class action, not a class member, that to challenge a settlement approval, you must show formal legal prejudice. You have a case that actually says in that context, you can show merely Article III standing. In a class—well, so there's no precedent for a settlement like this, an APA government settlement that settles a class action and there are interveners challenging it. There is—we're aware of no precedent for that. The closest precedent is the cases involving consent decrees or settlements in which interveners with an interest in the subject matter, an Article III interest, come in and challenge the objection. The fact that it is—that this case comes up in a class action context doesn't really challenge— doesn't really change the Article III inquiry. And it really boils down to the reputational harm that this court talked about and Kennedy v. Warren and other courts have talked about in the Foretich case, for instance, or the McBride case from the D.C. Circuit 20 years ago, in which all that is needed to be shown is that there is a published defamation. And the centerpiece of this settlement is a published defamation, not just against the three schools that are here today, but against 151 schools. The settlement and the defamation—a communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. That's the classical definition of defamation. Published defamation is injury in fact. It is a traditional concrete injury in fact. The Supreme Court held that in the TransUnion case. This court held it in Robbins v. Spokio on remand from the Supreme Court case. It's a classical injury that does not require any further special showing of damages. The Supreme Court talked about a very similar claim in Paul v. Davis in 1975. There's no additional requirement of damages. So that in itself satisfies the Article III injury in fact, and the redressability is also easily satisfied as the court said in the Kennedy decision. An order setting aside the judgment, an order setting aside the settlement, would redress the injury. And it redresses it in two ways. It limits the scope of the defamation, and it also removes the stigma from the defamation. That's all that's necessary for redressability in this context. Wasn't it true in the Kennedy case that by setting that challenge statement aside, you were necessarily suggesting that the challenge statement was invalid in some way? And I'm not sure that's true here, right? Like even if you got the relief that you wanted in this case, it wouldn't necessarily come with the impeter of the court saying that the schools listed in that exhibit haven't engaged in misconduct, which is the thing that you're upset about, right? So, I mean, I think that the injury in fact part here is pretty established, but the redressability I don't think is clean. Well, so in the Kennedy case, for instance, one of the statements that was being challenged was that the authors were engaged in potentially unlawful conduct. And this court said that's sufficiently close to unlawful conduct. That's a very close analogy to what's happening here. Yes, this is a carefully worded statement that is sufficiently close to an actual statement of wrongdoing. It says the department has determined that attendance at one of these listed schools justifies presumptive relief based on strong indicia regarding substantial misconduct by listed schools. That is sufficiently close to a determination of wrongdoing. And, in fact, it is being understood and used in that way by third parties, downstream parties. Let me make it more clear, I guess. In Kennedy, my understanding is that the relief that was asked for there was undo this statement, right? Take this statement away. And that's clear. Then you would take the sting out of that statement because the statement's coming away, and that's the relief that's being asked for. Here, the relief that's being asked for is don't let this settlement happen. And the statement that you're unhappy with is a statement made in the context of that settlement. But if we or if any court were to say, okay, you're entitled to that relief, we won't let the settlement go forward, we aren't necessarily going to say because the statement that you don't like is invalid. Yes, it comes away because the whole settlement comes away, but there's nothing about a court decision that necessarily has to weigh in on the validity of the thing you're happy about. Well, it's an excellent question. And this very situation was addressed in the Fortich case, Fortich v. United States in the D.C. Circuit. It's an extraordinary case in which Congress had passed a law. It was actually a bill of a tanger that was neutral on its face, but that suggested in a legislative process that led up to its passage that a particular individual was a child abuser. And he sued. He had standing. There's a very lengthy discussion by the D.C. Circuit that this was a defamatory statement and that a judicial order setting aside the law, declaring it unconstitutional, declaring that Congress had acted improperly, was sufficient redress for that reputational injury. And the court didn't have to say, you're innocent. Setting aside the order was the redress. And the court said that in this context, we assume that the order will be sufficient redress. That's really also exactly what happened in the Kennedy case. So it has come up before, and the redressability prong is really not a difficult prong to satisfy in this case. In addition, and independently, there is a harm from the deprivation of procedural rights that are- What about this issue Judge Sung raises? We have case law, primarily in the context of settling co-defendants who object, that seems to suggest that not as a matter of Article III standing, but as a matter of substantive law, there is a showing that needs to be made before a non-party to the settlement is able to be heard in objection to that. The Waller case is one which is cited in your reply. What is your response to that argument, to that line of case? Well, that is not an Article III, as Your Honor suggested. That's not an Article III objection, and the parties have not actually preserved an argument in this case. They haven't previously argued that there is a prudential bar in addition to the Article III. When would their first time, their first opportunity to argue a lack of standing to appeal the settlement approval would be on appeal? And they did raise it in their answering brief. Well, I would say that whatever prejudice requirement that is imported into prudential doctrine is clearly satisfied here. The schools are prejudiced by this settlement. Going to the procedural rights that the schools are losing from this settlement, there is under the 2019 rule is the best example of this. There are a series of rights that are afforded to schools as a matter of due process. The Department says over and over again that these are due process rights of institutions. Well, in the bar defense claims, my understanding is the school primarily submits information upon request, but there's a whole separate procedure that addresses when the Department can actually attempt to recoup. And it seems clear from the record here that there's nothing about the settlement that provides for recoupment from the schools. The Department, well, so a couple of points. There cannot be a recoupment proceeding unless there is an adjudication against the school in the step one process. And the Department has conceded that nothing in the settlements would count as an adjudication of the bar defense claims. Therefore, they can't recoup from the schools. The consequences of this step one or this bar defense process is more than just recoupment. There are other consequences that pertain to the school's financial responsibility score, for instance. And we cite those regulations in the brief. The Department also has instituted guidance that says that the settlements that the Department enters into with respect to student loans can be considered against schools in determining whether to go after executives of the schools, officers of the schools, for personal liability. We've raised this policy. We've raised this point in our briefing. The government has not responded to it. It's a discretionary determination that the Department can choose to rely on this very settlement in making those decisions against schools. There are a variety of ways within the Department beyond just recoupment in which schools are harmed by this determination, this determination that schools are presumptive wrongdoers. Let me ask you about, make sure I understand what you said in response to my question about the Waller line of cases. And as I understand what you're saying, they did not argue in the district court or in their principal brief on appeal that there was a sort of a threshold substantive bar from the substantive law in addition to Article III standing. Is that? We understand that the objection is just the Article III standing argument. And so not an additional prudential bar. Okay. That's the only threshold objection before we get to Merritt's arguments. That's our understanding. But should the court wish to consider prejudice, we think it's amply satisfied here. We've submitted, first of all, affidavits, really unrebutted affidavits from five school officials from four different schools. These are not affiliates. They're all independent schools attesting to the harm that schools are experiencing as a result of this settlement. These are the individuals in this world who would know best how schools are being affected by this settlement. We've shown evidence, and it's essentially unrebutted evidence because there's argument on the other side that it's really imaginary. It's speculative. But that is attorney argument. There's no evidence on the other side to rebut this evidence from the declarants. In addition, we've shown that a senator, for instance, is using this list, the 151 schools, to urge high school administrators in Illinois not to do business with the schools on this list. There are ample pieces of evidence in this record that show the prejudice that schools are experiencing as a result of this settlement. So whatever additional prudential requirement of prejudice that the court wishes to consider, it's established in this record. All right. Thank you, counsel. We've taken you over without question, so I'll give you some time for rebuttal. But we will hear now from the other side. Ms. Ellis first. Yes. May it please the court, Rebecca Ellis for the plaintiff class. I'd like to begin by addressing some of the mischaracterizations of the settlement in this case, where it came from, and what it actually does. The assertion that this was just a simple APA delay case really understates the history of this long and hard-fought litigation. During the period from February 2017 until this settlement was signed in June 2022, the Department of Education was consistently disregarding the APA and constitutional rights of borrower defense applicants. That began with the policy of delay. For most of those five years, the department simply did not decide any borrower defense applications. And, in fact, it was revealed eventually that they had a policy of not deciding borrower defense applications. There was actually a first settlement we attempted in this case, under which the department agreed it would decide the then-pending backlog within a certain amount of time. But unbeknownst to the plaintiffs, when we made that agreement, the department's plan to meet the deadline was simply to deny as many applications as possible. At one point, it had denied 95% of class members' applications that it considered over about a 10-month period, and it sent form denial notices that didn't give any explanation to the borrowers for why their claims had been denied. And so that's why the district court denied approval of that first settlement and said, clearly there was no meeting of the minds here. And furthermore, the department has been engaging in pretext. We need to find out what is really going on with the borrower defense process. And when we took discovery, we found that there was an entire previously undisclosed web of internal guidance at the department that had served first to prolong the delay and then subsequently to ensure that once decisions began again, they would almost all be denials. And so that's when we filed our supplemental complaint, adding claims under the APA for both the form denials and the underlying policies. All of that was very much in issue when the settlement was signed. The suggestion that the case was mooted by a litigation affidavit from the department is, it doesn't do justice to the scale of this problem. As of June 2022, none of the form denials had been rescinded. None of the underlying policies had been rescinded. And it's true that the department had granted some borrower defense applications, but it would be, you know, they'd announce a few thousand in August, then nothing, then a few thousand more in February. Meanwhile, more applications were being filed every day. There was no timeline. There was no plan to address the harms that were still accruing for delay, as well as the harm from the form denials and what we called the presumption of denial policy for what at the time was a backlog of over 260,000 borrower defense applicants. All of them had injury that was continuing to accrue, and that we— The 260,000 backlog was at the time in the settlement? Yes. Yes, Your Honor. And that the 90,000, once their applications were granted, they were no longer part of the class under the class definition. So there's no double counting there. It was about 260,000 at the time of the settlement. And the settlement itself was designed to vindicate the rights of these applicants that had been disregarded by the department. Part of that was finding a way to deliver decisions in a timely manner. As the district court found, if the department had to go through the backlog one by one, it would have taken something like 25 years, given the resources available. So there had to be a way to make decisions about how to resolve these applications in a more expedited fashion. At the time, the department had in front of it these 260,000 applications. In many cases, there were hundreds or thousands, even a couple of times tens of thousands of applications that related to a particular school. Many of those applications had similar allegations of alleged misconduct. The department also had evidence from other sources, whether from its own investigations, from state attorney general investigations, private lawsuits, congressional hearings, a wide range of sources. And so putting together all of that information and the volumes of applications at issue, what the department determined was that, okay, here are these groups of class members who we think are presumptively entitled to relief because they are more likely to be able to make out a plausible defense to repayment. And that is what Exhibit C is. It is not an official finding of misconduct. Contrary to the intervener's representations, it does not carry any administrative consequences. The department has been very clear about this. In addition to not being a basis for recoupment, it is also not a basis for other Title IV enforcement actions. And there you're referring to the individual officer action that your opposing counsel mentioned? Yes, Your Honor, as well as financial responsibility. And I believe the Department of Justice is prepared to address that in more detail. Before you run out of time, you've been talking about the merits. I'm curious what your position is on this standing question that we've raised under the Waller case and what's being referred to as prudential standing. Yes, Your Honor. Our position is that the interveners do not have independent standing to maintain this appeal, whether Article III standing or prudential standing. Did you argue below that they could not be heard based on a ground other than Article III? Well, Your Honor, in the initial intervention decision, that was obviously under a different standard. We argued that they had no protectable legal interest to intervene as a right. The district court ultimately granted them permissive intervention. Then at the final approval stage, that briefing was all concerned with the actual merits of their objections to the settlement. Okay. So the objections that were made threshold to them participating were Article III standing and whether or not they met the requirements of the rule on intervention. Well, Article III standing didn't become an issue until the appeal. We recognized below that an intervener doesn't necessarily need Article III standing in order to permissively intervene, and so that was separate. When the interveners sought to file a stay pending appeal, that was when we argued that they did not have Article III standing to maintain an appeal when neither of the parties and no class members had themselves appealed. Okay. But in terms of their grant of permissive intervention, you've not cross-appealed that order granting them permissive intervention? No, Your Honor. You plunged it on appeal and you agreed. We have not. We opposed intervention on any ground at the time, but we've not cross-appealed because the stated purpose that interveners said that they were coming into this case for was to object to the settlement. They didn't assert that they were intending to file any claims, independent claims, against any party. They simply said, we want to object to the settlement, and that was the basis on which the district court allowed them to intervene. They did object. Those objections were overruled. So at this point, I think the permissive intervention is water under the bridge, but at this point, once the actual injury to them and the redressability problems that the court mentioned come into play here on appeal, we argue that they do not have standing to maintain this appeal. So have you preserved the Waller prudential standing issue on appeal? We did not brief that issue, Your Honor. All right. Mr. Jando, did I pronounce that correctly? Jando, Your Honor. Jando. Okay. All right. Proceed. May it please the Court. Sean Jando for the Federal Appellees. I'd like to start this morning by talking about the Article III standing issue and then turn to the Waller issue. So starting with the Article III standing, I think maybe starting with the first strand, which is the procedural injury strand, there's just no procedural injury in this case. I think the Department has made very clear, I point the Court to ER 399 and 400, that it doesn't consider the settlement to be a determination or a finding of misconduct that could be relied on or be used as evidence in any future proceeding. The sort of automatic relief under the settlement isn't a borrower defense grant that could even serve as a predicate. But the statutory authority that you think allows this settlement is 1087EH, right? So we think there are two distinct sources of statutory authority. So one source is the Attorney General Settlement Authority to settle claims in litigation. And then the second and distinct source is the Compromise and Settle Authority that's in 1082, 1082A6. And so we think those are the two sources of statutory authority. Okay. So you don't rely on this one. And 1082 is in the other statute? So 1082 is in the education-related statutes. 1082 itself talks about what are called FFEL loans, which are loans that used to be granted or they're not a thing anymore. And so we think that 1082, when read in conjunction with a provision of 1087, that — But 1082 by its own terms wouldn't apply here. So 1082 on its own terms does not apply here. It's when read in conjunction with 1087. But we think that the Court doesn't need to reach that. With 1087, what I just referred to. So there's two different provisions of 1087, Your Honor. There's a provision that says that direct loans, which are most of the loans at issue in this case, shall have the same terms, conditions, and benefits as FFEL loans. And then there's a separate provision that provides for the Substantive Borrower Defense Authority. And so we think that, you know, to the extent that what the interviewers are saying is that the Attorney General's statutory authority to settle the claims in litigation is limited in some way by the Secretary of Education's Substantive Authority, that the first sort of most direct, most impactful Substantive Authority the Secretary of Education has in this area is the Borrower Defense Authority, the authority to grant borrower defense claims. And so that, if anything, would be what sort of bounds or undermines the Attorney General's settlement authority. And so sort of switching or sort of moving back to the procedural piece of this, there's just nothing. I think the Department of Justice is very clear, and I can make it very clear at the podium, that the Department does not consider the settlement to constitute any finding of misconduct that could be relied on in any future proceeding. That's a future recruitment proceeding, a future fiscal responsibility proceeding, any future proceeding. And on the sort of going after individual officers piece of things, I would encourage the Court to look at the guidance that the interviewers cite. I think the guidance itself makes very, very clear that it's talking about settlements that the schools enter into, not the settlement, which the schools are not a party to. It certainly does say in sort of colloquial terms that these are terrible actors, and certainly sort of at the core of what the settlement is doing is saying that, you know, because these particular schools that this class went to are bad actors, and, you know, there's this authority that allows us to, you know, take that into account, that as part of this settlement we're going to let these loans go. And so there's certainly a reputational hit in there, both in terms of the statement that's made and in terms of this sort of whole theory of how this works. I don't think that's right, Your Honor. I mean, the settlement itself says almost nothing about the schools. I mean, I think they're pointing to sort of various ancillary statements, and even those statements, you know, I think describe the Department's reason for entering into the settlement. I think it's a very sort of nuanced statement that talks about that there's litigation risk here. The Department has made a determination that these borrowers should receive this presumptive relief as part of this overall strategy of trying to clear out the backlog of hundreds of thousands of pending applications. And I don't think there's anything there that's the sort of— But this isn't just that, you know, we had a big backlog, and so because we've been bad as the government in being inept and incompetent in processing these, we're going to give a whole bunch of people relief. We're going to give a subset of people relief based on this sort of borrower defense-type theory of you were badly treated by your school. I mean, I don't think that's quite right, Your Honor. It's a combination of the indicia of misconduct, alleged or proven. I think the Department has made clear that in some circumstances the misconduct is just alleged, and the number of claims, which is just sort of a fact that I don't think anyone is challenging. But even if you disagree with us on sort of the injury piece of this, I think there's a serious addressability problem here. There's just a huge mismatch between the legal theories and claims that are being asserted by the interveners and that reputational harm, and I have no idea. But the redressability just has to ameliorate the harm to some degree. It doesn't necessarily mean that the legal theory of the cause of action matches the theory of injury. It just makes the bad thing go away, and so this would take down the whole settlement with the attached exhibit and the whole theory that they're bad actors and that's why you're identifying this group. It all goes down. So I'm not sure what you mean by take down, Your Honor. I mean, it's a public filing. It's a matter of public record. It's on the district court docket. This isn't like, for example, in the Kennedy case where one of the things that was being sought was a letter or was an order to actually take down the allegedly defamatory statement and remove it from the Internet. And so, I mean, at this point— What about their response to the Bill of Attainment case? I mean, Congress wasn't ordered to issue a retraction. Yes, Your Honor, and I think there was a really serious stigmatic harm that the court thought could be redressed. I mean, here, again, I think an order from this court saying, you know, the Attorney General lacked statutory authority to enter into the settlement or something of that nature just isn't the sort of thing that would redress any stigmatic harm that they think they've experienced, and it's certainly not— What about the public, like, media announcements that the department has issued sort of touting the efforts against bad actors? And I think that those—you can read those as sort of referencing this settlement. So I don't think so, Your Honor. I mean, the two press releases they cite in the reply brief, one is about PSLF relief. It has nothing to do with them. And then it sort of says at the end, here are some other things the department has done. And I actually think the provision about bad actors I think is distinct from a provision in sort of the very bottom of this press release talking about this settlement. And then the other one is also, again, just not about this settlement, not about them. There's like a little statement at the end of the press release when the department's going through lots of other things it's done that I don't actually read as being about this settlement. And I think we have to work really, really hard to construe those press releases as saying anything defamatory or injurious to the reputations of the interveners or the schools related to this settlement. And I think, you know, the other piece of this is that they talk a lot about sort of the concrete consequences of this reputational harm to show the reputational harm. And I just don't think there's any evidence in the record that in order from this court, again, saying something like the AG didn't have statutory authority here would do anything to change any third party's behavior, reactions, particularly given that the settlement and the department's articulated reasons for entering into the settlement are now matters of public record. And then maybe switching to the Waller piece, although happy to come back to that as well. Can I ask you actually about Rule 23? Because no one has really talked about that. This was done as a B2 class only? That is correct, Your Honor. But there's highly individualized monetary relief for lots of people. How is that? I thought you couldn't do that kind of monetary relief in a B2 class. So we objected to class certification in district court, Your Honor. Obviously, that objection was overruled repeatedly by the district court. I think the sort of important thing for this court's purposes is, number one, I don't think there's any cause of action that the interveners have to object to the class certification. And number two, even if— Why would that be? So a couple things, Your Honor. I mean, number one, there's just— Again, it makes it go away. I mean, it blows up the whole thing. You can't do this. The settlement will go. The whole thing will go. But I think they still need a cause of action to object to it. And I think this is how I at least would read Waller, which, you know, Waller talks in terms of standing. It's a 1987 case. I think the best way to read it is as talking about sort of statutory standing or prudential standing, which are things I think we would now put in the cause of action zone of interest bucket. And so even if you think that the interveners here have Article III standing to sort of be heard in this case, they still—I think Waller makes it very clear—need some additional, in the words of Waller, formal legal prejudice to give them the right— But was that raised below? I mean, counsel for the plaintiffs candidly conceded they didn't raise that. So I don't think we raised it below, Your Honor. I mean, in district court, they intervened. And I think Waller sort of separates out the intervention question from the ability to object to the settlement question. And the district court, in discussing intervention, said, you know, I have my own responsibility, independent responsibility, to consider these issues, and I think it would be helpful to have adversarial briefing on them. And so in that context, you know, it wasn't that there needed to be an objection for the district court to have to think about those issues. The district court had its own responsibility, too, and so I don't know why or how we would have objected to the district court considering these questions. Now that we're on appeal, you know, I think they do need that cause of action. We have absolutely advanced an argument in our brief that they don't have a cause of action to challenge the district court's approval of the settlement, the Rule 23 issues, the mootness question, and, you know, also that whatever cause of action they might have to challenge the Attorney General's decision to enter into the settlement, which is sort of a distinct cause of action, is one that sort of, A, doesn't apply here because they're not within the zone of interest of the relevant provisions, and, B, just would give them, I think, access to a very limited set of arguments that, in large part, are not arguments that they're raising in this case. And then sort of on the merits, I think, sort of the one merits issue that the court really discussed, I think the AG here, it's very clear, has what this court called plenary discretion in Carpenter to settle litigation. That's extremely broad discretion. And, you know, I think the starting point is it seems very hard for me to imagine that the AG couldn't authorize the settlement of an individual borrower defense claim once it got into litigation. I know the interviewers have been a little cagey about whether they think that's right or wrong. I think it— What's your response to their invocation of the regulation that they cited? So I don't think the—well, so the regulation about fraud, I think, is regulation that's talking about not compromising claims where the debtor has committed fraud. Which is debtor or other interested parties? I mean, I think the way to read that regulation is that, you know, if you have committed fraud, we're not going to give you the benefit of compromising your claim. I mean, it's sort of—it would be really odd to say if you were the victim of fraud or you alleged that you were the victim of fraud, that that's a claim that we couldn't compromise. And so I don't think that that's— Well, it wouldn't be great in the sense of, well, you'd better get— the government shouldn't be settling and giving away the money. It should be getting it from the bad person and making them pay it. Well, so I don't think the compromise authority, Your Honor— I don't think the decision to compromise restricts the department from sort of going after the third party for the underlying misconduct. It just can't use, in this context or in this case, the settlement as evidence of the underlying misconduct. But to the extent that there was underlying misconduct, the department could sort of independently go after it. But in addition, you know, I think that regulation is really speaking about the secretary's compromise authority, the 1082A6 authority, and not the attorney general's settlement and compromise authority, which is sort of a distinct—again, I think the sort of authority that we're really primarily relying on here. And again, I mean, every day the United States settles litigation arising out of individual administrative adjudications. All of those administrative adjudications, you know, think the individual borrower defense claim, the individual social security claim, they all have many, many procedural regulations that govern how they are adjudicated administratively. I don't think anyone thinks—I'm not aware of any case law to support the idea— that the only thing that the department or the United States can do in that situation is sort of rerun the adjudication rather than settle in litigation. If I'm remembering the record correctly, the department has settled on a collective basis borrower defense claims, correct? So the record indicates circumstances where the department has used the 1082 authority— where the secretary of education has used the 1082 authority to compromise claims in the borrower defense context or claims where there were also sort of borrower defense claims pending. I'm not sure whether the department has compromised individual sort of borrower defense claims in litigation through— I understand what you're saying. In processing borrower defense claims, the department, if I'm recalling the district court decision correctly, cited evidence that, you know, they would settle 23 claims, for example, all at once or grant 23 borrower defense claims all at once. Yes, that is correct, and there are sort of—yes. And again, you know, I think if the department or if the attorney general can settle one claim in litigation, he can settle a class of claims in litigation. There's not sort of a bar between those two things. And the cases they cite, I think, are just very far afield. I mean, the Fourth Circuit case, the executive business media case, it was a case involving sort of the settlement of a claim where the government agreed to award a contract to the plaintiff that someone else thought should have been subject to competitive bidding procedures that were circumvented. And again, that's just a situation where you have kind of administrative regulations that are meant to govern sort of a multilateral process, and that's just far afield from this sort of bilateral adjudication. Going back to the Waller issue, with my understanding in that there's both case law in this circuit and in many circuits that an intervener does not necessarily have standing to appeal, essentially, from the approval of a voluntary settlement. And the same rule applies to co-defendants who are not parties to the settlement. The same rule applies to non-class members, so that they have to show formal legal prejudice. So why isn't the kind of, in your view, defamation or procedural harm not formal legal prejudice in this case? I mean, number one, we just don't think that harm exists at all. But number two, and I think Waller itself, to the extent that's the framework this Court's applying, draws a pretty sharp distinction between the sorts of general injuries that might suffice for Article III and really what it terms formal legal prejudice, which I think is a very high bar. And the examples that Waller gives are things like, you know, if a settlement with one co-defendant purports to bar a second co-defendant from litigating a contribution or identification claims, that's the sort of formal legal prejudice that would let the second co-defendant object to the settlement. But I think, you know, the idea that some third party, some interloper into this bilateral process just doesn't like the settlement, thinks that it implies negative things about them, it's just a much, much lower bar that I don't think there's really any support for the idea that that's enough to give rise to a cause of action to challenge the settlement, even if you're already sort of in the case, if you're a co-defendant or you've intervened. But you didn't argue in the District Court that they needed a cause of action in order to raise objections to the settlement? No, Your Honor, although, again, I think the District Court had the independent obligation to ask all these questions and come to its own conclusion, and I think in many ways treated the interveners... But you opposed intervention? I believe we did, Your Honor. I mean, we don't think they have the sort of legal entitlement. Right, but did you file an opposition to intervention in which you said they would need a cause of action in order to be heard in raising objections? No, Your Honor, so I think Waller, I think it's Waller that makes this very clear that there's a distinction between intervention and the right to object to the settlement, and that even people who can intervene who would satisfy the relatively low standard, certainly for permissive intervention, don't necessarily have the right to object to the settlement. And the District Court, again, I mean, the District Court, I think, was very clear that it wanted to consider the intervener's arguments because it wanted to assure itself that Rule 23 was satisfied, that the case wasn't moot, that the settlement was fair, and thought that adversarial briefing would be helpful on that issue. And so I think saying, you know, you don't have a cause of action to make these arguments is just something that wouldn't have made sense in that context. But now the District Court has assured itself of all of those things, and you do need to have a party here with both Article III standing and the cause of action that would let it challenge the settlement. And did you preserve the Waller issue on appeal? I think so, Your Honor. I mean, we didn't cite Waller, but I think that's sort of exactly the analysis that we're making in the cause of action zone of interest bucket. And I think, again, Waller uses the term standing, but sort of statutory standing, prudential standing, is something that I think we would characterize today as more of a cause of action zone of interest issue. But I think we certainly made that argument, and I think Waller provides additional support for our views on that. Thank you, Counsel. Thank you, Your Honor. All right. And we'll put two minutes on the clock for rebuttal for each since we took them over. If we can just switch the order here, I'll do my rebuttal first with the Court's permission. So I think we've heard that the Waller issue was not preserved. It's not argued in the briefing. It wasn't argued below. Government has said that it's basically the equivalent of the cause of action issue. That was never argued below. The zone of interest issue, never argued below. This appeal has enough issues. That is not an issue. Waller doesn't have to be preserved below. I think the government reads that case correctly. They separate out intervention, and then they separate out the ability to appeal. So why does that? I mean, I just don't see how you argue that it has to be preserved below. It's not preserved on appeal either. It's not an issue that was argued in this case, and it's prudential, so it would be waivable, and it was waived in this case. So I think that's not an issue. Why didn't the cause of action argument in the government's answering brief raise the issue? We intervened as defendants in this case, so we're not in the position of permits. You're only granted permissive intervention, which isn't the equivalent of what the Waller dubs standing to appeal. Well, again, I just come back to the fact that this was not an issue that was presented below. It's not presented in the briefs, and it's an issue that's prudential and not jurisdictional. The only issue that was presented is jurisdictional. We addressed that this morning. As for the harms, the harms from this settlement, the schools are being accused of wrongdoing by students, and they have a forum in which to rebut, to meet that evidence. This settlement deprives them of that forum, and that is a great part of the harm that schools experience from this settlement. They have no, and they have a statement from their regulator, their primary federal regulator, stating to the world that the schools are presumptive wrongdoers. I just want to give you another opportunity to answer my question because I think Judge Forrest said there was no obligation to raise what we'll call the Waller issue below. The government says we raised it in our answering brief by arguing there's no cause of action. You said, well, my response to that is that they didn't raise it below, but that doesn't account for, so assume Judge Forrest is correct that there was no duty to raise it below. Why doesn't the cause of action argument in the government's answering brief put the Waller issue before us? Well, I think that we don't need to have a cause of action in order to object. That's the first thing that I would say. With respect to whether there is a cause of action, we came in to object to a settlement. We were not given an opportunity to plead claims or counter claims. Did you file any kind of pleading in the district court when you intervened? One of the intervener schools, it was the Everglades, filed an answer. Yes, so there was a pleading of record. Again, though, this is an issue that's coming up at the oral argument. It's not preserved at any stage, including on appeal. A statement, though, I really have to underscore. The statement from a primary regulator toward regulated parties that they are presumptive wrongdoers is inherently prejudicial. It was inherently harmful for schools. If I could draw an analogy, suppose a bar association publishes a list of lawyers and says we have found sufficient indicia of wrongdoing, of substantial misconduct by these lawyers. No one would question that that is deeply prejudicial and that causes an injury. That's exactly the same injury that the schools are experiencing in this case, and we provided evidence to back that up. I want to just return one last thing. You said that you don't think the issue was raised, but didn't you cite Waller in your reply? We did not cite Waller, Your Honor. With respect to Waller? Waller is cited in the reply brief. In the reply brief? It's cited as even if we had to meet that standard, it's met. Oh, yes, I beg your pardon. I know the standard. I believe it was just in a footnote on page 27. No, it's not. No, it's in the carryover from 26 to 27. Yes, it was in response to the argument that you had to have, that Rule 23 had to supply basically what would be equivalent to the cause of action to object. Yes. And you said that that hadn't been raised below, and that even if it were true, you then used Waller actually saying you would meet that kind of a standard. Certainly. I mean, we've shown ample evidence of prejudice here, so if the Court is going to reach the issue, there's a clear record here of prejudice. But, again, it's not an issue that has – I keep coming back to the fact that it has not been issued. There was never an argument in the District Court that the schools lacked a cause of action and, therefore, should not be heard on that basis. And that's the same – we just heard from the government attorney that that's the same argument that is being raised here on appeal, that that is a prudential issue, and prudential issues can be waived. I would simply just add one final point, is that we've heard from 20 states about the broader significance of a settlement, of this settlement. It's an issue that's deeply personal to the schools. It's also part of a broader issue, and a settlement that violates the law, that violates the Constitution, and that violates an agency's own regulation is unlawful, and courts can and do often set them aside. There's many examples of this. This Court has done it on numerous occasions. This case is no different. Thank you. Thank you. And we'll hear from Mr. Panuccio. Thank you. Thank you, Your Honor. I'm going to try to make a few points on rebuttal here. Let me begin with the government's argument on statutory authority. What you heard, Your Honor, they said, well, we point to two distinct sources, 1082A, and then they also cite the AG's authority combined with 1087E. I want to note 1087E-H was never raised below by anyone. This is the appeal was the first time they raised it. It is waived as a source of authority. You can look at excerpts of Record 276 and 277, and the PSER at 96. They only raised 1082A-6. It's also wrong, however, because they say 1087E is enough authority for the Secretary and the Attorney General because the only thing they're waiving are mere procedures. 1087E is not mere procedures. What it says is that the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert. It doesn't say that the Secretary has a free-willing authority any time he thinks there's even an allegation of an act or omission to cancel and discharge loans. And it's also wrong because procedural constraints do apply. That's this Court's clear holding in the United States against Carpenter. As for the other authority that they actually raised below, that's 1083. What's your response to the government's response on the regulation? I think they're misreading the regulation, Your Honor. If you look at the plain text of the regulation, what it says, the title of the regulation is, How does the Secretary exercise discretion to compromise a debt or suspend or terminate collection of a debt? H, nothing in this section authorizes the Secretary to compromise or suspend or terminate collection of a debt involving fraud, the presentation of a false claim, or misrepresentation on the part of the debtor or any party having an interest in the claim. That suggests you must engage in individualized review. You cannot just simply say there's an entire class of people. Is your position that the school is covered by that last clause, the last phrase, rather? Well, I think the school is certainly a party having an interest in the claim, but you don't even need to get to the last clause because it says if there's a misrepresentation on the part of the debtor. This settlement says it does not matter what is in those borrower adjudication applications. They could be false. They could be time-barred. They could have nothing. They could have just signed their name to a piece of paper. We're granting them. So the Secretary has done no individualized review of these applications, which is exactly what this says because if there was a misrepresentation on the part of the debtor, the Secretary has said in his own regulation, I cannot compromise or settle that claim. And that's the whole problem with this settlement. What about the AG's General Settlement Authority, which they've said is the primary basis of what they're relying on? This court and others have said time and time again, this is U.S. v. Carpenter, this is the Bonneville Power case. The AG does not have a free-willing authority to create law in settlements and otherwise act in a way that would be unlawful for the agency. The Attorney General is the chief legal officer, but he is still bound by the laws of the United States. He cannot settle claims in ways that are otherwise unlawful, and that is what this settlement is all about. They are trying to engage in a rulemaking process through settlement. This is rulemaking through settlement, which this court has said repeatedly is not allowed. Lastly, Your Honor, if I may, I know I'm over time, but Rule 23 was brought up, and two issues there. One, counsel for the plaintiffs said, well, the settlement is just finding a way to deliver timely adjudications, and that's why we had to have the Exhibit C, subclass 1. That only points out that there were significant tradeoffs made between the classes here, which is a Rule 23 problem that wasn't analyzed. Indeed, there's an entire class in the settlement that was never even certified. The entire subclass 3, the post-class applicants, were a class that there was no analysis by the district court, no motion to certify that class, and yet this is a class action settlement that was approved, and that's just one of many Rule 23 problems we point out in our brief. And I'd like to close, Your Honor, just by saying it's somewhat amazing to hear both the government and plaintiffs' counsel here in litigation say Exhibit C and the list of 151 schools is really no big deal, and the court should ignore it. Both the government and plaintiffs' counsel have used that exhibit in the public to absolutely bludgeon these schools, both in terms of reputation and in terms of what the federal regulator might do. It cannot be forgotten. The Department of Education is the regulator for these schools. They hold the life of these schools in their hands. They can decertify them. So to have a... So to the extent that they are doing that, why can't your clients file a defamation claim against them? Why does it require undoing the settlement in this case? Well, Your Honor, the settlement is the source of the injury, and I think if we can file a defamation claim, it only points out the harm and the standing that we have in this case. You'd have to prove the merits of your defamation claim in that lawsuit. Well, it's always true for standing that a party ultimately has to. The Court Claims Act has a defamation exception. Right, but it... It doesn't allow claims for defamation. Right, of course. But it's always true, Your Honor, just to get to the point. I mean, standing is different than the merits. A party always has to ultimately prove the merits of their claim. The question is whether we've been injured. And I just wanted to close by saying you can... My friend went through it, but there is a series of harms that have been imposed, including by the very agencies and attorneys who are making these arguments today, using the list as an absolute bludgeon against these schools, and that is the harm we are trying to ameliorate here. Thank you. Thank you, counsel. Thank all the counsel involved in this case for the very helpful arguments and the matter of Sweet v. Everglades College is submitted for decision, and we will stand in recess for the day. All rise.
judges: COLLINS, FORREST, SUNG